## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

CAROLYN BROWN                                                    PLAINTIFF

v.                               No. 2:07CV00059 JLH

AT&T LONG TERM DISABILITY PLAN
FOR MANAGEMENT EMPLOYEES                                         DEFENDANT

### OPINION AND ORDER

Carolyn Brown commenced this action pursuant to § 502(a) of ERISA to recover long-term disability benefits allegedly due her under a plan sponsored by her former employer, AT&T Corp. The administrative record has been filed, and both parties have submitted briefs, so this case is ripe for decision. For the reasons stated hereinafter, the Court remands Brown's claim for long-term disability benefits to Metropolitan Life Insurance Company, the Claims Administrator for the plan.

### I.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (citing 29 U.S.C. § 1132(a)(1)(B)). Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the "plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). Where a plan gives the administrator such discretion, the

administrator's decision is reviewed for an abuse of discretion.  *Woo*, 144 F.3d at 1160 (citing *Firestone*, 489 U.S. at 115, 109 S. Ct. at 956-57).

Under the abuse-of-discretion standard, the proper inquiry is whether Hartford's decision was reasonable, that is, whether it was supported by substantial evidence.  *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  "Substantial evidence is 'more than a scintilla but less than a preponderance.'"  *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)).  "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision.  *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).  Under this standard, the Court should consider only evidence that was before Hartford when the claim was denied.  *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003).

To obtain a less deferential review, a plaintiff must demonstrate "that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her."  *Woo*, 144 F.3d at 1160.  "To satisfy the second part of this requirement, [the plaintiff] must only show that the conflict or procedural irregularity has 'some connection to the substantive decision reached.'"  *Id.* at 1161 (quoting *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 901 (8th Cir. 1996)).  "For heightened review to apply, a beneficiary claiming procedural irregularities must show that the plan administrator, in the

2

exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision." *Neumann v. AT&T Commc'ns, Inc.*, 376 F.3d 773, 781 (8th Cir. 2004). "[T]his requirement 'presents a considerable hurdle' for plaintiffs . . . ." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) (quoting *Barnhart v. Unum Life Ins. Co. of Am.*, 179 F.3d 583, 588 n.9 (8th Cir. 1999)).

## II.

The AT&T Long Term Disability Plan defines disability as follows:

"Disability" or "Disabled" shall mean, for the one-year period commencing immediately after the 52 weeks of Sickness Disability Benefits have been paid, that the Eligible Employee is prevented by reason of such sickness or injury, other than accidental injury arising out of and in the course of employment of the Company, from engaging in his or her occupation or employment at the Company, for which the Eligible Employee is qualified, based on training, education or experience. Thereafter, an Eligible Employee shall continue to be considered as disabled under the Plan if, in the sole opinion of the Claims Administrator, the Eligible Employee is determined to be incapable of performing the requirements of any job for any employer (including non-AT&T employment), (as a management or occupational employee), for which the individual is qualified or may reasonably become qualified by training, education or experience, other than a job that pays less than 50 percent of the Eligible Employee's Eligible Pay that would have been in effect on the day preceding the day that the Eligible Employee's Sickness Disability Benefits ceased.

(Adm. R. 514.) The plan provides for fifty-two weeks of paid short-term disability benefits. (Supp. Adm. R. 11.) A participant of the plan may be eligible for long-term disability benefits after the fifty-two weeks of short-term disability benefits have expired. After the period of short-term disability has expired, a participant must meet the following definition:

- During the first year of receiving LTD Plan benefits, you're unable to perform all of the duties of your job because of an illness or injury, and
- After the first year of receiving LTD Plan benefits, you're unable to do any job for any employer for which:
  — You're qualified, or

3

> — You may become reasonably qualified by training, education or experience, other than a job that pays less than 50% of your LTD Eligible Pay prior to the commencement of LTD Plan benefits.

(Supp. Adm. R. 11.)  Furthermore, the summary plan description states, "At all times during your disability, you must be under a physician's care and following the recommended course of treatment in order to receive LTD Plan benefits."  (Supp. Adm. R. 11.)

The plan administrator is AT&T Corp.   As noted above, MetLife is the Claims Administrator.  The plan gives both of them discretionary authority.  (Adm. R. 536-37.)  The parties agree that this Court should review for abuse of discretion.

## III.

Carolyn Brown worked for AT&T Corp. for approximately twenty-four years and had become a manager in the St. Louis, Missouri, area.  The record contains the following description for Brown's job with AT&T:

NETWORK OPERATION BUSINES[S] MANAGEMENT SPECIALIST

This candidate will be responsible for interfacing with customer technical support centers on a 7 day by 24-hour basis.  Candidates are required to have a broad technical knowledge and understanding of IP Networks and Services, combined with creative and independent thinking.  Must also have experience in managing network outage events.  Outstanding written and verbal communication skills are required.  Candidates are required to have a thorough knowledge of SAS, ISP ADMIN, and ISP Status systems and processes.  Candidates must have a thorough knowledge of CISCO UBR, Docsis, and HP Openview.

(Adm. R. 233.)

Brown began receiving short-term disability benefits in the summer of 2002 as a result of "major depression."  (Adm. R. 242-44, 265-68, 284, 291, 295, 301.)  Brown was under the care of a psychiatrist, Dr. Jay Englehart, and she was seeing a therapist, Susan Rutledge, M.Ed., LCSW,

both in the St. Louis, Missouri, area.  In February 2003, MetLife referred Brown to N.R. Muddasani,

M.D., for an independent psychiatric examination.  Dr. Muddasani concluded:

DIAGNOSIS:    Axis I:    Major Depression, recurrent without psychotic features
Post traumatic stress disorder

Axis II:    No diagnosis

Axis III:    None

Axis IV:    Stress of not being able to return to work

Axis V:    GAF 40[1]

RECOMMENDATIONS: Patient is unable to make a safety commitment if she were to return to work at this time.  I am unable to certify that the patient is able to return to employment.  Patient would benefit further tritating [sic] her antidepressant medication, i.e.: increasing the Effexor 150 mg bid may also need to an anti-psychotic medication to work on some paranoia and delusions.  Prognosis is good if the patient is treated aggressively and return back to full employment.

(Adm. R. 206.)

On May 15, 2003, Dr. Englehart completed an Attending Physician Statement in which he

again reported that Brown had major depression with psychosis.  (Adm. R. 173.)  He stated that

Brown was not able to return to work.  (Adm. R. 174.)  On June 30, 2003, MetLife notified Brown

that her claim for long-term disability benefits was approved effective June 20, 2003.

On November 17, 2003, MetLife notified Brown that in order to continue to receive benefits

she "must be under a physician's care and following the recommended course of treatment . . . ."

That same letter also requested that Brown complete and return Activities of Daily Living (ADL)

---

[1] GAF is an acronym for the Global Assessment of Functioning Scale, a 100-point scale used to assess psychological, social, and occupational functioning of adults.  A score of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *See* http://depts.washington.edu/washinst/Training/CGAS/GAF%20Index.htm.

and authorization forms, which she did, reporting that she had "major spells of depression (constantly crying and feeling suicidal)" and that she had begun receiving Social Security disability benefits effective April 2003.  (Adm. R. 142-44.)

During a telephone conversation with a MetLife claims manager on December 17, 2003, Brown told MetLife that she had traveled to Mississippi and was staying with her mother.  (Adm. R. 39.)  Also on December 17, 2003, MetLife sent letters to Dr. Englehart[2] and Susan Rutledge requesting the following information to assist in its evaluation of Brown's continuing disability claim: a copy of office notices from January 1, 2003, through the present, copies of objective testing reports, and interpretative results of any testing performed.  (Adm. R. 134-35.)  The letters also asked that the information be submitted prior to December 28, 2003.

Neither Dr. Englehart nor Susan Rutledge responded by December 28.  As a result, on December 30, 2003, MetLife sent Brown a letter stating:

> According to the information on file, you have been eligible for Long Term Disability benefits since June 20, 2003.
>
> At all times during your disability, you must be under a physician's care and following the recommended course of treatment in order to receive LTD benefits. We wrote to your providers, Susan Rutledge and Jay W. Englehart MD and requested updated medical information.  We asked that they provide the information no later than December 28, 2003.  To date no information has been received in our office.
>
> Please follow up with your providers and have them submit:
>
> _X _   Copies of your office notes from January 1, 2003 to the present,
> _X_   Copies of objective testing reports (i.e. x-rays, lab results, treadmill tracings), and
> _X_   Interpretive results of any testing performed.

---

[2] The salutation in the letter to Dr. Englehart said, "Dear Ms. Rutledge."

Failure to submit these forms via fax or US mail by January 20, 2004 will have an impact on your eligibility.  We provided a copy of your signed authorization with our request.

(Adm. R. 133.)

Dr. Englehart's office submitted updated medical information on February 17, 2004. According to Dr. Englehart's records, Brown had last been seen on February 7, 2004, and during that visit she reported that she had been "out of town again," that she had not "gotten labs done," that she had been "staying in Arkansas [with] parents," that she "gets depressed when alone," that her "mother makes sure she takes meds," and that she "gets out more regularly [with] parents."  (Adm. R. 122.)  Dr. Englehart's records for Brown's visit the prior month also reflected that Brown had been traveling to Arkansas, that she had "more energy" and was "less paranoid."  (Adm. R. 123.)

According to Susan Rutledge's notes, Brown was seen on February 3, 2004, and reported that she had been with family, that these visits helped her moods, that being alone adds to her depression, and that, at times being in a crowd causes her anxiety.  Rutledge's records also reflected that, prior to February 3, Brown had been seen on December 27, 2002, January 7, 2003, January 14, 2003,[3] February 18, 2003, February 24, 2003, February 25, 2003, March 4, 2003, April 11, 2003, April 24, 2003, May 7, 2003, June 18, 2003, August 15, 2003, September 29, 2003, and November 12, 2003. In November 2003, Brown reported that she would be leaving on November 14 to stay with her family.  (Adm. R. 116-19.)

Upon receiving the updated information from both Dr. Englehart and Susan Rutledge, MetLife's case manager submitted the information to a nurse consultant for review.  (Adm. R. 42.) The case manager also called Dr. Englehart's and Susan Rutledge's offices to discuss whether Brown

---

[3] The January entry actually is dated 2002, but it is apparent that this note records a visit in 2003.

had the ability to perform any occupation, the requirement for continuing to receive LTD benefits after the first fifty-two weeks, as opposed to whether she had the ability to perform her last job at AT&T, which was the requirement for receiving LTD benefits during the first fifty-two weeks of eligibility.  (Adm. R. 44.)

On April 22, 2004, Susan Rutledge returned the call and stated that Brown was still depressed and anxious, was stable, had not been hospitalized, and was not suicidal.  (Adm. R. 44.)  An employee from Dr. Englehart's office called on April 27, 2004, stating that Dr. Englehart was only in the office on Thursdays and that he had said that there was no change in Brown's condition sine her Social Security evaluation.  On May 13, 2004, Dr. Englehart left a voice message with MetLife's claim manager stating that Brown's last office visit had been on May 1, 2004, and that during that visit she reported that she had decreased energy, was sleeping during the day, had decreased concentration, was living with her parents in Arkansas, and has death wishes when she is outside. Dr. Brown said that he believed that Brown was still disabled and could not be in public places for long periods of time due to her psychotic circumstance.[4]  (Adm. R. 45-46.)

After receiving Dr. Englehart's voice message, the claims manager attempted to contact Brown by telephone.  However, Brown's telephone had been disconnected.  Thus, a letter requesting that Brown contact MetLife regarding her claim was sent on May 13, 2004.  On May 18, 2004, when Brown had not yet responded to MetLife's request, her claim was suspended.  Also on May 18, the nurse consultant determined that Brown should be sent to an independent medical examiner.  (Adm. R. 46.)

---

[4] The claims manager's note says, "due to her psychotic sx," which we have interpreted as "psychotic circumstance."

On May 27, 2004, the MetLife claims manager received a call from Brown stating that she was staying with her daughter in Missouri and, if she was not there, she would be with her parents in Marvell, Arkansas.  During the call, Brown was informed that she would need to go for an independent medical examination, which was scheduled for June 17 and June 18.  (Adm. R. 47-48.)

On June 24, 2004, MetLife received a copy of the result of the Independent Medical Examination (Psychological), which was performed by Paul Detrick, Ph.D., a psychologist with Florissant Psychological Services, Inc.  Dr. Detrick's examination included the administration of four tests – the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Trauma Symptom Inventory (TSI), Beck Depression Inventory-II (BDI-II), and Structured Interview of Reported Symptoms (SIRS) – as well as a mental status interview, and a record review.  (Adm. R. 98-104.) Dr. Detrick stated that the MMPI-2, the TSI, and the SIRS indicated a very strong probability that Brown was exaggerating the severity of her symptoms.  (Adm. R. 99-102.)  With regard to the Beck Depression Inventory, he said:

> Performance on the BDI-II indicates depression in the severe range.  Patient has endorsed symptoms of depression across all subcategories with the most extreme symptoms noted on subcategories including self-criticalness, past failure, agitation, fatigue and a loss of interest in sex.  Patient has endorsed items indicating that she had thoughts of harming herself but reports that she would not carry out these thoughts.

(Adm. R. 100.)  He found that Brown's thinking was logical and coherent, and that she was well groomed and cooperative.  (Adm. R. 100.)  Dr. Detrick concluded:

> This is a 51-year old divorced female referred for IME by Best Doctors.  Patient has been off work since June 2002 and in treatment for major depression.  She has received ongoing outpatient care that has included medication management and psychotherapy from July 2002 to the present time. Despite reporting significant continuing symptoms of depression, patient acknowledges improvement in her condition and the frequency of outpatient visits has been reduced from weekly to once per two months.  An independent medical exam undertaken on 1/24/03 yielded

findings of major depression, recurrent w/o psychotic features and PTSD.  Patient was described as unable to return to work at the time of evaluation; however, the prognosis was considered good for return to work if treated aggressively.  Current assessment has yielded consistent evidence of exaggeration of severity and range of depressive symptomology across data sources (inventories, interview data, behavioral observations).  Patient appears to be receiving considerable family support and reportedly assumes little responsibility for even fairly routine requirements of daily living.  She expresses no intent to turn to work and harbors considerable resentment toward her employer for a perceived lack of appreciation for 24 years of service.  This resentment also appears focused on a manager who became patient's supervisor immediately prior to her leaving work and is seen by patient has [sic] being unfair to her.  Patient has taken no steps toward returning to work and in fact has purposely refrained from contact with her employer.  Treatment efforts currently appear to be primarily focused on supportive/maintenance rather than aggressively promoting greater independence and a possible return to work.  This is very likely consistent with patient's goals as she appears generally satisfied with her current life circumstances.  Patient appears to this examiner capable of assuming greater responsibility for activities of daily living including a gradual return to work initially under conditions of low stress and reduced responsibility.  She will need considerable support from treatment providers as well as the cooperation of family members for this effort to succeed, as the incentives for making such changes are likely to be perceived by patient as minimal at the present time.  The addition of a vocational rehabilitation component to her treatment may be beneficial.  The prognosis for successful return to work is considered guarded.  Patient's current symptoms appear most consistent with a diagnosis of:

> Axis I: Major Depressive Disorder w/o psychotic features, in partial remission
> Axis II: None
> Axis III: None
> Axis IV: Not at work
> Axis V: GAF 55[5]

(Adm. R. 102-03.)  Dr. Detrick answered two follow-up questions:

> Please find below a reply to your request for clarification of the response to the following questions:
> B.  Please comment on her motivation to return to work.  Please indicate any factors that are preventing her from performing any occupation.
> C.  Does the claimant currently appear so globally psychiatrically impaired as to preclude working any occupation?  Please specify the specific

---

[5] A score of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

restrictions and limitations that are preventing her from performing any occupation.

Response to question B: Patient expresses an intent to not return to work, therefore, is not motivated to do so. She is angry at her employer for a perceived lack of appreciation for 24 years of service. She also appears to be receiving considerable support from family members for her current living circumstances that include not working.

Response to question C: Patient exhibits a low tolerance for stress as well as lack of incentive for returning to work. If patient's treatment providers could be contacted and involved in assisting her return to work and/or a vocational rehabilitation component be added to her current treatment regimen, it is anticipated that she could gradually return to work in a low stress environment within six months.

(Adm. R. 104.)

After MetLife received Dr. Detrick's report, the MetLife claims manager, according to her notes, faxed a copy of the report to Susan Rutledge and attempted to coordinate a telephone conference to discuss the IME results and Brown's claim. On August 18, 2004, the claims manager received a voice message from Susan Rutledge stating that Brown's last visit was on February 3, 2004, that Brown had missed office visits in the past few months, she was staying out of state with family members, and that her next office visit was scheduled for October 2004. (Adm. R. 50.) The administrative record does not show that MetLife sent the IME report to Dr. Englehart, nor does it show that MetLife contacted Brown to see whether she was seeing a therapist other than Rutledge or a psychiatrist other than Dr. Englehart.

On September 14, 2004, MetLife wrote Brown to tell her that it had made an adverse determination on her claim for benefits. The letter stated, in pertinent part:

It is decided that the information in file shows a decrease in the frequency of your outpatient visits and improvement in your condition. It does not show treatment of a severity of disability as to preclude you from doing your own or any other job you may be qualified for. Therefore, your benefits are terminated effective 9/30/04.

(Adm. R. 92.)  The letter also advised Brown of her rights to appeal and to file a civil action.  (Adm. R. 92.)

Brown wrote a letter of appeal on October 8, 2004.  (Adm. R. 85-86.)  She stated in the letter that she suffered "from homicidal and suicidal thoughts and extreme anxiety," as well as memory loss and major depression.  (Adm. R. 85.)  She also called MetLife on November 5, 2004, and said that she had moved to Arkansas, that she would be submitting more medical information, and that she had an appointment with a psychiatrist, Dr. Matthews, on December 6, 2004.  (Adm. R. 54.)

Additional medical information was submitted by Dr. Englehart, Susan Rutledge, and a therapist from Counseling Services of Eastern Arkansas.  Dr. Englehart wrote:

> Clinically, she continues to do poorly despite multiple changes in her medication. She complains of poor sleep, appetite, concentration and energy.  She is frequently depressed and seldom leaves the house.  She feels that people are talking about her when she does leave, and she has paranoid ideation which has extended beyond those at work and in the public to those within her family.  She has frequent suicidal and homicidal ideation, and recently had a restraining order taken out against her after she threatened to kill a family member with a knife.

> While Ms. Brown's follow-up is not optimal, I believe this is related to her illness and the severity thereof.  I would not be able to certify her to return to work given her long-standing paranoia and ideas of reference combined with her recent threats of violence toward others.  It is my opinion that having her return to work at this time would be a set-up for disaster, as I would be concerned that working in a setting with other people may cause her to have an increase in paranoia and may result in either threats or actual violence given her current condition.

> Even assuming that she was able to refrain from violence, her consistent complaints of concentration and energy deficits ma[ke] it unlikely she would be able to perform in any job at this time.

(Adm. R. 74.)  Susan Rutledge wrote:

> Enclosed you will find copies of my most recent progress notes on Carolyn J. Brown. Carolyn is continuing to have difficulty with her depression as well as controlling her responses to her anger.  She is currently staying with her family and traveling to her

appointments with myself and her psychiatrist.  If you have any questions about Carolyn, you can contact me at 314 837-4900.

(Adm. R. 71, 88.)  The progress notes submitted by Rutledge reflected that Brown had seen Rutledge on September 22, 2004, October 1, 2004, October 28, 2004, and December 2, 2004.  (Adm. R. 72, 89.)  The progress notes stated that Brown "seems healthier i.e. weight gain," that she had experienced problems with a member of her home, which triggered a desire to harm, but she settled down; that she still felt very anxious around others; that she feels others are talking about her; that she is fearful at times, gets hopeless with suicidal ideation; and that she is easily agitated.  (Adm. R. 89.)  The records from Counseling Services of Eastern Arkansas showed that Brown had been seen on December 6, 2004, for depression, after having been referred by Dr. Matthews.  (Adm. R. 75-81.) Brown signed a "suicide contract" with the therapist from Counseling Services of Eastern Arkansas promising not to commit suicide and promising to call if she felt suicidal.  (Adm. R. 81-82.)

On December 22, 2004, Brown's appeal was referred to Robert Heilbronner, Ph.D., ADPT, a board certified clinical neuropsychologist and an independent consultant reviewer for MetLife. Dr. Heilbronner wrote:

> Based upon my review of the available information, there appears to be evidence of ongoing psychiatric difficulties subsequent to 09/30/04.  However, this is complicated by the fact that Ms. Brown has not been especially compliant with her treatment, having essentially discontinued therapy back in 02/04.  Yet, she was continuing to be maintained on appropriate medications.  There is clear evidence to suggest that part of the reason she has not returned to work is because of ongoing resentment and hostility towards her employer.  Clearly, any attempts to return to her own occupation would have to include addressing this issue.  Ms. Brown has made no attempts to return to her previous job or any other occupation.  Clearly, there seems to be some secondary gain issues whereby family members have taken over certain ADL's and have reinforced illness behavior.  There are reports of problems of concentration and memory problems but no evidence to suggest that a formal mental status exam nor a neuropsychological evaluation have been done. Additionally, there is evidence to suggest that previous psychological IME resulted in invalid test results reflecting an over endorsement of psychopathology.

13

At this time, further documentation is warranted in order to determine whether or not there is ongoing psychiatric impairment at this time. Additional treatment notes from her new psychiatrist and treating therapist in Arkansas would be important for this purpose.

This should also include mental status examination documentation impairments in cognitive function (e.g. reduced memory and concentration). In the absence of documentation supporting ongoing psychiatric impairment at this time, it is my opinion that Ms. Brown is capable of returning to work. Efforts to return to work at her previous place of employment should be done in concert with a plan to minimize resentment and hostility. A vocational evaluation would also be useful in order to ascertain the degree to which her work skills and aptitudes are in place for returning to productive employment. Finally, it may be worthwhile to consider an independent neuropsychological examination in order to more formally assess the possibility of malingering/feigning of disability and alleged neurocognitive impairments.

(Adm. R. 65-66.)

On January 10, 2005, MetLife issued its final determination on Brown's appeal, upholding the original denial of benefits. (Adm. R. 68-69.) A letter notifying Brown of the decision was sent that same day. In pertinent part, the letter stated:

To assist in our appeal review, your entire medical file was reviewed on January 4, 2005 by an onsite Independent Physician Consultant who is a Board Certified Clinical Neuropsychologist. It was noted that you were not especially compliant with your treatment and had significantly reduced the frequency of your appointments with your psychiatrist and therapist. Although the notes indicate reports of problems of concentration and memory problems, there is no evidence to suggest that a formal mental status examination nor a neuropsychological evaluation was completed. In addition, there is evidence to suggest that a previous psychological IME resulted in an invalid test result that reflected an over endorsement of psychopathology. The Consultant advised that further documentation is warranted in order to support the presence of an ongoing psychiatric impairment. There were no recent treatment notes from your new psychiatrist and treating therapist that would offer documented psychiatric impairments. In the absence of any recent mental status examinations and office notes that document psychiatric impairments, the information would support the ability to return to work.

(Adm. R. 67-69.) The letter also informed Brown that she had exhausted her administrative remedies under the plan. (Adm. R. 69.)

14

IV.

Brown argues that MetLife abused its discretion by failing to give more credence to the opinion of the treating physician, Dr. Englehart, than to the opinion of the two consultants who reviewed the case, Dr. Detrick and Dr. Heilbronner.  The defendant correctly responds that the Supreme Court has held that plan administrators are not obliged to accord special deference to the opinions of treating physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967, 155 L. Ed. 2d 1034 (2003).  Apart from that argument, Brown contends that MetLife abused its discretion by concluding that she was no longer disabled without adequate medical evidence to support that conclusion.  Brown also argues that MetLife abused its discretion in failing to obtain additional medical records from her psychiatrist and therapist in Arkansas.

The defendant argues that there was a lack of objective evidence to support the conclusion that Brown continued to be disabled, citing a line of cases from the Eighth Circuit holding that it is not an abuse of discretion for a plan administrator to deny a claim because of a lack of objective medical evidence to support a finding of disability.  *See Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir. 2006); *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006); *Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005); *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004); *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002). The evidence that a plan administrator may require to prove eligibility for disability benefits depends on the terms of the plan and the circumstance of the case.  *Johnson*, 437 F.3d at 813; *Pralutsky*, 435 F.3d at 838-39; *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001).  It is generally not unreasonable for a plan administrator to deny a claim based on a lack of objective evidence.  *Johnson*, 437 F.3d at 813.

The written notice of an adverse determination must include:

(i)     The specific reason or reasons for the adverse determination;

(ii)    Reference to the specific plan provisions on which the determination is based;

(iii)   A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)    A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. 2560.503-1(g).  Here, the plan documents say that the claimant and her physician must complete forms provided by the claims administrator and that the claimant may be required to take a medical exam administered by a physician chosen by the claims administrator.  (Supp. Adm. R. 16.)  The plan documents also say that if a claim is denied the notification of the decision will include a description of any additional information necessary for the claimant to perfect the claim and an explanation of why the information is necessary.  (Supp. Adm. R. 17).  MetLife's letter to Brown notifying her of the adverse determination did not describe any additional material or information necessary for Brown to perfect her claim.

Although the defendant is correct that the treating physician rule does not apply in ERISA cases, and although the defendant is correct that the Eighth Circuit has held on several occasions that a plan administrator does not abuse its discretion by denying benefits based on a lack of objective medical evidence of disability, the record in this case nevertheless shows that the claims administrator abused its discretion when it decided to terminate Brown's long-term disability benefits.

The initial decision to terminate Brown's long-term disability benefits followed the Independent Medical Examination (Psychological) performed by Dr. Detrick.  Although Dr. Detrick

16

found that Brown was exaggerating the severity of her symptoms, he nevertheless concluded that she had Major Depressive Disorder without psychotic features, in partial remission, and that on Axis V her global assessment of functioning score was 55, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  He initially opined that the prognosis for a successful return to work by Brown "is considered guarded."  (Adm. R. 102-03.)  In response to a follow-up question from MetLife, he stated that Brown exhibited a low tolerance for stress but that she could gradually return to work in a low stress environment within six months if her treatment providers could be involved in assisting her return to work and/or a vocational rehabilitation component could be added to her current treatment program.  (Adm. R. 104.)  Nothing in the record shows that the conditions stated by Dr. Detrick for Brown to return to work were ever met or that anyone attempted to meet them.  No one contacted Brown's treatment providers to involve them in assisting her to return to work or to suggest that they add a vocational rehabilitation component to her treatment program.  When Dr. Englehart reported on November 6, 2004, he expressed the opinion that having her return to work at this time would be a set-up for disaster, Adm. R. 74, which makes it unlikely that the first condition imposed by Dr. Detrick – that the treatment providers would join in a plan for returning Brown to work – could be met.  No one inquired to see whether it was feasible that Brown could "gradually return to work" at AT&T or anywhere else.  Assuming that these conditions could be met, Dr. Detrick's opinion was that Brown could "return to work in a low stress environment."  (Adm. R. 104.)  Any reasonable person could infer from Dr. Detrick's report that Brown could not work in a high stress environment.  MetLife's letter explaining its adverse determination stated that Brown's condition had improved and she had decreased the frequency of her outpatient visits, but Dr. Detrick took those facts into account, along with his opinion that Brown

17

exaggerated her symptoms, and he still concluded that Brown might return to work in a low stress environment but not, apparently, in a high stress environment.

MetLife, however, concluded that Brown was not precluded from doing her own or any other job for which she may be qualified. (Adm. R. 92.) Her own job required "interfacing with customer technical support centers on a 7 day by 24-hour basis" and "managing network outage events." (Adm. R. 233.) This is not the job description for a "low stress environment." Any reasonable person would expect that dealing with customer technical support centers on a 7 day by 24-hour basis and dealing with network outage events would make for a high stress work environment. No reasonable person could conclude from Dr. Detrick's report that Brown would be able to return to her own occupation. Nevertheless, that is exactly what MetLife concluded. Although MetLife also stated in its letter to Brown that she could perform any other job for which she may be qualified, MetLife undertook no analysis to see whether she was qualified for a low stress job that would pay at least fifty percent of her "Eligible Pay" at AT&T. (*See* Adm. R. 514-18.)

Nor does Dr. Heilbronner's report require a different conclusion. Dr. Heilbronner wrote that there was evidence that Brown had ongoing psychiatric difficulties subsequent to 09/30/04, the effective date of the termination of her long-term disability benefits. (Adm. R. 65.) Dr. Heilbronner wrote that, in the absence of documentation supporting ongoing psychiatric impairment at this time, it was his opinion that Brown was capable of returning to work, but, like Dr. Detrick's opinion, his opinion was not unqualified. (Adm. R. 66.) Dr. Heilbronner certainly did not say that Brown was capable of working in a high stress environment; indeed, he said that efforts to return to work at her previous place of employment should include a plan to minimize resentment and hostility, which is consistent with Dr. Detrick's opinion that she might be able to work in a low stress environment but

not, apparently, in a high stress environment.  Dr. Heilbronner recommended a vocational evaluation to ascertain the degree to which her work skills and aptitudes were sufficient for her returning to productive employment.  (Adm. R. 66.)  MetLife did not seek such an evaluation, presumably because it had concluded that Brown could return to her own occupation.  Finally, it should be noted that Dr. Heilbronner's opinion was qualified inasmuch as he said, in the absence of documentation supporting ongoing psychiatric impairment, it was his opinion that Brown could return to work; but, he clearly thought that additional documentation was needed.  He thought that additional treatment notes from Brown's new psychiatrist and treating therapist in Arkansas were important, and he thought it would be worthwhile to obtain an independent neuropsychological examination to assess the possibility of malingering and alleged neurocognitive impairments.  (Adm. R. 66.)  MetLife did not pursue any of the information that Dr. Heilbronner recommended that it pursue, nor did it invite Brown to submit this information.  The record does not show that MetLife informed Brown that Dr. Heilbronner thought that this additional information was necessary before the letter notifying her of the decision to deny her appeal and informing her that she had exhausted her administrative remedies.

In summary, Dr. Detrick ultimately opined that Brown could return to work, in a low stress environment, if certain conditions were met; and Dr. Heilbronner recommended that additional information be obtained but in the absence of additional information opined that Brown could return to work in concert with a plan to minimize any resentment and hostility.  Brown's own occupation was as a network operation business management specialist interfacing with customer technical support centers on a "7 day by 24-hour basis" and managing network outage events, which, one would think, is a high stress job in which resentment and hostility are encountered on a regular basis.

Based on the reports of Dr. Detrick and Dr. Heilbronner, no reasonable person could conclude that Brown could return to her own occupation.

Despite the recommendation from Dr. Heilbronner that a vocational evaluation be done, MetLife made no investigation to determine whether Brown could work in a low stress occupation that pays fifty percent or more of her eligible pay.

Furthermore, MetLife did not comply with 29 C.F.R. 2560.503-1(g) in that it did not tell Brown that she needed to submit additional information – objective medical evidence – to perfect her claim.

> In simple English, what this regulation [29 C.F.R. 2560.503-1] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); *see also Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005); *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 774 (10th Cir. 2004); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003). Here, MetLife first told Brown that its adverse determination was based on the fact that the information in the file showed a decrease in the frequency of her visits and improvement in her condition and did not show treatment of a disability so severe as to preclude her from doing her own or any other job. (Adm. R. 92.) Brown appealed and submitted information addressing those issues. (Adm. R. 71-72, 74, 75-82, 88-89.) Then, in response to Brown's appeal, MetLife told Brown that her appeal was being denied because "there is no evidence to support that a mental status examination nor a neuropsychological evaluation was completed" and "further documentation is warranted in order to

20

support the presence of an ongoing psychiatric impairment." (Adm. R. 68-69.)  However, MetLife neither sought this information nor asked Brown to provide it.  Instead, it told Brown that she had exhausted her administrative remedies without pursuing or giving her an opportunity to provide this information.  (Adm. R. 69.)  In other words, Brown provided that information that the initial letter informing her of the adverse determination seemed to require and then, after that information had been provided, the letter denying the appeal stated that she had failed to provide information of a different character.

Again, no reasonable person could conclude from the record that Brown can return to her own occupation.  It is impossible to tell from the record whether Brown could work in another job that would pay fifty percent or more of her Eligible Pay.  Therefore, the claim will be remanded for further consideration.

## CONCLUSION

For the reasons stated above, this action is remanded to Metropolitan Life Insurance Company, the Claims Administrator for AT&T Long Term Disability Plan for Management Employees, for further consideration consistent with this opinion.

IT IS SO ORDERED this 20th day of March, 2008.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE